WARNER BROS. PICTURES, Inc. v.
DISTRICT OF COLUMBIA.

Nos. 9536, 9537.

United States Court of Appeals
District of Columbia.

Argued Dec. 4, 1947.

Decided March 29, 1948.

Mr. Lawrence A. Baker, of Washington, D. C., for petitioner. Mr. Henry H. Elliott, of Washington, D. C., also entered an appearance for petitioner.

Mr. Harry L. Walker, Asst. Corp. Counsel, District of Columbia, of Washington, D. C. with whom Messrs. Vernon E. West, Corp. Counsel, and Chester H. Gray, Principal Asst. Corp. Counsel, District of Columbia, both of Washington, D. C., were on the brief, for respondent.

Before GRONER, Chief Justice, and STEPHENS and WILBUR K. MILLER, Associate Justices.

WILBUR K. MILLER, Associate Justice.

These appeals from decisions of the Board of Tax Appeals for the District of Columbia bring before us a question as to the coverage of the District income tax law.

The controversy arose from these facts: Warner Brothers Pictures, Inc., a Delaware corporation, is a producer of photoplays. Its photographic negatives of plays are sent to its wholly owned subsidiary, Ace Film Laboratories, Inc., in Brooklyn, which manufactures therefrom as many positive prints as may be required for exhibition in motion picture theatres. Another wholly owned subsidiary, Warner Brothers Distributing Corporation,[1] solicits patronage of exhibitors, ships positive prints to those who engage them, and collects the agreed charge for the exhibitors' temporary use of the films. Distributor operates thirty-one offices or "film exchanges" throughout the United States, each of which hires films to theatres of the area in which it is located. Positive prints are shipped by Ace to the several film exchanges of Distributor where they are kept in stock until shipments to theatres are made. The theatre operators return the prints to the film exchanges after using them for the agreed length of time.

Distributor's thirty-one offices remit to its New York office the gross amounts collected from exhibitors for their use of positive prints and, finally, in New York City, Distributor settles periodically with Warner under an arrangement hereinafter described. Payments to Warner are made by Distributor on a nationwide basis; that is say, Warner is not furnished with a breakdown of Distributor's collections as to geographical sources, and so is not informed as to the amount being paid to Distributor for the use of Warner's positive prints by exhibitors in any one geographical unit.

---

[1] For brevity, Warner Brothers Pictures, Inc., will be referred to as "Warner," Ace Film Laboratories, Inc., as "Ace," and Warner Brothers Distributing Corporation as "Distributor."

One of those offices or film exchanges of Distributor is located in the District of Columbia, from which Distributor sends films to the theatres in the District and in Virginia, Maryland and portions of other states.

Quite apart from the arrangement just described, Warner itself operated a theatre in the District of Columbia during the fiscal years ended in 1941 to 1943, inclusive. It filed District income tax returns for those three years, disclosing as taxable income the revenue from the operation of its theatre, but nothing more; and having disposed of the theatre prior to the fiscal year ended in 1944, it filed no return for that year.

The Assessor of the District of Columbia, who is charged with administering the District income tax law, concluded that Warner was subject to taxation on that part of the money received by it from Distributor which was based upon Distributor's collections from theatre operators in the District during the fiscal years ended in 1941 to 1944, inclusive. Being without exact information as to the amounts received by Warner with respect to moneys collected from District exhibitors, the Assessor applied an allocation formula to Warner's total receipts from Distributor, and in that manner determined the sums derived by Warner, during the years involved, on account of the moneys paid by District exhibitors for their use of Warner's positive prints. Upon that basis he levied deficiency assessments against Warner for the first three years here involved, and an original assessment for the fourth year, as no return at all had been filed for that year.[2]

Warner appealed to the Board of Tax Appeals in two separate positions, one for relief from the deficiency assessment, and one from the original assessment covering the fourth year. We are asked to review the Board's decisions, which were adverse to Warner. As the proceedings involve identical questions, they were heard together in this court and will be disposed of in one opinion.

The assessments were made under a District of Columbia statute [3] which imposes an annual tax "upon the taxable income from District of Columbia sources of every corporation, whether domestic or foreign * * *." The statutory definition of gross income includes "income derived from * * * sales or dealings in property, whether real or personal, growing out of the ownership, or use of, or interest in, such property; also from rent * * * and income derived from any source whatever." [4]

To ascertain whether this income was taxable to Warner we must find whether it was from a source within the District of Columbia. The activities which gave rise to the income were engaged in under a contract between Warner and Distributor, some provisions of which are shown in the margin. [5]

[2] The propriety of using the formula and the accuracy of its result are not challenged, but conceded, by the petitioner. The only issue is whether there was tax liability at all.

[3] Title 47, § 1502(b), D.C.Code, 1940, 56 Stat. 42, ch. 33, § 1(a), 56 Stat. 376, ch. 433, § 1.

[4] Title 47, § 1504(a), D.C.Code, 1940, 56 Stat. 43, ch. 33, § 1(b).

[5] These quotations from the contract are pertinent:

"1. Producer (Warner) hereby grants to the Distributor, and the Distributor hereby accepts the right, license and privilege to distribute * * * all photoplays and trailers produced by or for Producer. * * *

"2. The gross film rentals derived and collected by the Distributor * * * shall be divided as follows:

"Twenty percent (20%) thereof shall be retained by the Distributor and the remaining eighty percent (80%) thereof shall be turned over and paid to Producer as and when received by the Distributor. * * * * * * *

"4. Producer agrees to lease to the Distributor as many positive prints of each photoplay licensed hereunder as may be required. Legal title to all positive prints shall at all times remain in Producer, and the Distributor agrees to return all such prints to Producer upon the expiration or sooner termination of this agreement, or when the Distributor shall no longer require same for distribution purposes. * * * * * * *

"7. This agreement in no wise constitutes a partnership between Producer and Distributor. Distributor is not the

The fact that the gross rentals collected by Distributor from exhibitors for the use of Warner's films were to be divided between the two corporations is a characteristic tending to stamp the arrangement as a joint adventure between them. On the other hand, a later provision of the contract that Warner was to lease[6] the positive prints to Distributor is not consistent with the notion that the enterprise was a joint adventure. If it be thought that the contract was purely one of lease, the provision as to division of the rentals received by Distributor through subletting the films was simply the yardstick which measured the price Distributor was to pay for the use of the prints which it hired from Warner.

Under the conception of the contract as establishing a joint adventure, the two adventurers used the positive prints in the District of Columbia by hiring them to theatres therein.[7] If the contract was a lease of the prints from Warner to Distributor for subletting to theatres, then Warner used the prints in the District of Columbia by leasing them to Distributor therein. Whether joint adventure or lease, the sums received by Warner came from District sources because the location of personal property which is the subject of hire betrays the source of the owner's income derived from the hire.[8]

But we need not decide whether under the contract there was a joint adventure, a simple lease or some other relation; the simple fact, which cannot be avoided by any technicalities of construction, is that Warner's photoplays were hired to District exhibitors and Warner received a percentage of the money paid by them. Legal niceties cannot destroy the actuality that such money was income from sources within the District.

The petitioner cites to us the case of James v. United Artists Corporation, 305 U.S. 410, 59 S.Ct. 272, 274, 83 L.Ed. 256, in which it was held that a West Virginia statute which levied a tax upon every person engaged within that state in the business of collecting income from the use of real or personal property did not apply to United Artists Corporation. That corporation shipped photoplay prints from its film exchange outside West Virginia to renters within the state. The consideration was a percentage of the admission fees, and was paid to United Artists outside West Virginia. The decision is not applicable to the present case because the West Virginia statute which was being construed is unlike the provisions of the District income tax law. This clearly appears from the Supreme Court's opinion, from which we quote: "We are not here concerned with the question whether a state, by a statute appropriately framed, may lay a tax on income derived from sources within it * * *. No such taxation is attempted by § 2(i)." In this case we are concerned with a statute which lays a tax on income derived from sources within the District of Columbia.

It seems to us that the decisions of the Board of Tax Appeals were correct. They are, therefore,

Affirmed.

---

representative or agent of Producer and agrees not to so hold out in any manner whatsoever."

[6] It is plain that the word "lease" was used in the contract as meaning "hire."

[7] Should it be suggested that there was no joint adventure because of the lack of certain characteristics which are sometimes held to be essential to the creation of that relation, it would follow that the contract was one of employment (if not a simple lease). In that view there would be no change of result as to Warner's liability for the tax.

[8] The District statute provides that the Assessor "shall apply as far as practicable the administrative and judicial interpretations of the Federal income tax law so that computations of income for purposes of this chapter shall be, as nearly as practicable, identical with the calculations required for Federal income tax purposes." D.C.Code, 1940, § 47—1529.

It is provided in the Internal Revenue Code, Title 26, § 119, U.S.C.A., that rentals from property located in the United States shall be treated as income from sources within the United States. Mertens says in his Law of Federal Income Taxation, § 45.35, vol. 8, p. 310, "* * * the physical location of the subject of the rental betrays the source of income." In the administration of the federal law, the fact that the geographical location of property determines the source of rent received for its use is well established and no longer questioned.

STEPHENS, Associate Justice (concurring).

Except for the fact that under the agreement between Warner Bros. Pictures, Inc., and the Distributing Corporation the legal title to the films remains in Warner Bros., I think the separate corporate entity of the Distributing Corporation would insulate Warner Bros. from the tax—there being no contention, or basis therefor (since the Distributing Corporation was formed before the tax statute was enacted), that the Distributing Corporation was formed for the purpose of tax avoidance. It is true, as urged by Warner Bros., that the Distributing Corporation under the agreement has in practical effect an owner's power over the use of the films and that eventually they are junked and the junk value paid to the Distributing Corporation; it is true also that the Distributing Corporation treats the films as its own in personal property tax returns in the District of Columbia. Nevertheless, during the period of their use in the District of Columbia ownership of the films is in Warner Bros. Legal title is expressly retained. That is a fact which cannot be ignored. The statute taxes the "income from District of Columbia sources of every corporation, whether domestic or foreign . . ." D. C. Code (1940) § 47–1502(b), and defines gross income to include "gains, profits, and income derived from . . . dealings in property, whether real or personal, growing out of the ownership, or use of, or interest in, such property . . ." D. C. Code (1940) § 47–1504(a). Thus the income in question in the case is derived from the use of Warner Bros.' property, and this use is in the District of Columbia and the income is therefore from a District of Columbia source.